RAMP & PISANI, LLP
60 Westervelt Avenue
P.O. Box 249
Tenafly, New Jersey 07670
201-567-8877
fred@rampandpisani.com
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____

M.S., individually, and as guardian ad litem,
For A.S.,

                Plaintiffs,                Civil Action No.

     v.                              COMPLAINT AND JURY DEMAND

MEREDITH CORPORATION, MEREDITH
VIDEO STUDIOS and PARENT TV,

                Defendants.
_____

       Plaintiffs, M.S., individually, and as guardian ad litem for A.S., residing in the Borough of Fair Lawn, County of Bergen, State of New Jersey, through their attorneys, Ramp & Pisani, LLP, complaining of the defendants, say:

## JURISDICTION

       The court has jurisdiction of this matter under 28 U.S.C. 1332 (Diversity), as well as pendent jurisdiction over the state law claims.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

       1.  Defendant, Meredith Corporation (hereinafter referred to as "Meredith"), is one of the nation's leading media and marketing companies with businesses centering on magazines (Better Homes & Gardens, Family Circle, and Parents), book publishing, television

broadcasting, integrated marketing and interactive media.  Meredith maintains headquarters in Des Moines, Iowa.  Meredith proclaims that for nearly a century Meredith brands have been committed to providing women with information and inspiration to create a rich and meaningful life.

    2.  One of Meredith's brands is Parents®, which operates defendant, Parent.tv.

    3.  Defendant, Meredith Video Studios (hereinafter referred to as "Meredith Video"), is owned and operated by Meredith and is a full service video development, production and multi-platform distribution company.  One of their platforms is Parent TV who provides video on demand via mobile and cable TV.

    4.  Meredith Video main headquarters is located in Des Moines, Iowa.  They also maintain corporate offices in New York, Illinois and California.

    5.  In March, 2009, M.S. became pregnant for the first time.

    6.  M.S. was interested in breastfeeding her child when she gave birth.  As are many first-time mothers, she was apprehensive and uncertain whether she would be able to successfully breastfeed her child.

    7.  During the course of her pregnancy, she retained a professional lactation consultant to assist her in alleviating her fears and concerns about breastfeeding.

    8.  Through a series of innovative classes, training methods and parenting techniques, the lactation consultant educated, empowered and inspired M.S. to attempt breastfeeding.

    9.  Shortly thereafter, on December 9, 2009, M.S. gave birth to a beautiful and wonderful little girl, who she named A.S.

10. M.S. began to breastfeed A.S. with the lactation consultant monitoring M.S.'s progress. Although there were difficulties along the way, M.S. was able to overcome them and successfully breastfeed A.S.

11. Thereafter, the lactation consultant approached M.S. and told her that she was engaged by Parent TV to appear in an educational/instructional breastfeeding video. The lactation consultant advised Parent TV that she thought M.S., and her beautiful daughter, A.S., would be perfect candidates to appear in the video because she believed M.S. was a testament to how a first-time mother could overcome her fears and successfully breastfeed a child.

12. After some serious trepidation, M.S. advised the lactation consultant that she would be interested in participating in the breastfeeding video because she felt her own personal experience would be insightful and helpful to other first-time mothers who are considering breastfeeding.

13. On or about January 8, 2010, M.S., along with her daughter, A.S., traveled, in a snowstorm, to the New Jersey home of the lactation consultant.

14. Upon arrival, M.S. and the lactation consultant met with a woman in charge of the video shoot, whom M.S. believes was the producer. Since both M.S. and the lactation consultant were participating in an educational, instructional video with Parent TV for the first time, they wanted to know the process and Parent TV's intentions with regard to the filming and use of the video. The woman in charge of the video production specifically represented to both, M.S. and the lactation consultant, that the finished video would not disclose, either audibly or visually, the full name (first and last) of either M.S. and/or A.S.

She also represented that the breastfeeding video would be used for educational and instructional purposes only and that the video would be shown on their website and cable TV.

15. Based on these representations, M.S., on behalf of herself and her daughter, A.S., agreed to participate in the breastfeeding video. M.S. participated in the breastfeeding video without seeking compensation, celebrity status or publicity.

16. The video shoot took place at the lactation consultant's New Jersey home and lasted from the morning until early afternoon. During the video shoot, M.S. answered a series of questions and demonstrated breastfeeding A.S.

17. After the shoot was complete, M.S. packed up A.S. in her car seat and was about to leave the premises. The woman in charge told M.S. that she had to sign a piece of paper that was on a kitchen counter top. She asked M.S. to sign the paper on behalf of herself and A.S. She did not ask M.S. to read it first before she signed it. She did not advise M.S. that she should have an attorney review it before she signed it. She did not explain to M.S. the content of the paper. M.S. believed that she was signing a paper, which confirmed what had been represented to her in the morning before the shoot.

18. Without reading or reviewing the paper, she signed the paper.

19. Months went by and no one had contacted M.S. about the airing of the video. M.S. has previously worked in public relations for all types of companies. As a result, she occasionally searched her name and the companies she worked for, through the Google search engine.

20. In early July 2010, she decided to Google her name. When she typed in her full name, she was horrified to view what the Google search revealed. The first page of the search revealed link after link linking her name to pornography and pornographic websites.

21. When she investigated further, she discovered that the links brought you to a video, which combined actual footage from the breastfeeding video with pornographic video using a woman with similar features and stature to M.S. Based upon information and belief, it appears that the creator of this video spliced pornographic video with live footage from the breastfeeding video. Reading the links and watching the video would have the viewer believe that it was M.S. in both the breastfeeding video and the pornographic video. The same video also contained footage of M.S.'s minor daughter. The links connect A.S. to pornography.

22. M.S. was mortified and shocked to learn that the defendants filmed, edited, and produced the breastfeeding video using M.S's first and last name, contrary to the representations made to M.S. before the video shoot.

23. Had the defendants not used M.S.'s last name, the creator of the pornographic video would not have been able to link up the breastfeeding video and the pornographic video with M.S. and A.S. connecting both of them to pornography.

24. Defendants' use of the first and last name of M.S. in the breastfeeding video was contrary to the explicit representation made to M.S. prior to the shoot.

25. Defendants did not disclose the full name of other mothers and babies participating in their other institutional and educational videos, including other breastfeeding videos, which were available for viewing on the Internet during this time frame.

26. M.S. also later discovered that defendants' breastfeeding video had been posted on You Tube. The posting on You Tube was contrary to the explicit representation made to her prior to the shoot. Based upon information and belief, Parent TV prevents downloading of breastfeeding videos and other institutional and educational videos from its website. Parent

TV, however, does not attempt to prevent downloading of its breastfeeding videos and/or other institutional or educational videos, which it posts on You Tube.

27. M.S. immediately notified defendants and the lactation consultant as soon as she discovered these horrific links and video.

28. Subsequently, M.S. spent countless hours and sleepless nights trying to identify and report the websites, links and users of this spliced breastfeeding/pornographic video. As of the middle of July 2010, search engines, such as Google and Yahoo, link and associate M.S. and her daughter, A.S. with pornography and pornographic sites and in other sexual negative contexts. The lactation consultant also spent countless hours trying to assist M.S. in her quest to repair her and her daughter's damaged reputation.

29. M.S. was initially successful in having some of the videos removed, but the links with the verbiage linking her and her daughter's name with sexual comments and pornography remained.

30. M.S. became consumed with looking each and every day and into the night to see what else would show up on the Internet. It took a tremendous emotional toll on her.

31. Due to her tireless efforts, M.S. provided the lead to who may have been the main perpetrator in creating the doctored video.

32. The lactation consultant and her husband followed M.S.'s lead and uncovered who the possible perpetrator was. He was identified as an individual named "Nizarddd". This individual reposted the video back on You Tube, six months ago. Defendants have made no effort to monitor him or have him shut down.

33. M.S. engaged in a campaign and relentless effort to shut down this perpetrator.

34. M.S. found out that there are companies who specialize in reputation management.

35. M.S. and the lactation consultant passed along all of the information they were able to find to the defendants. In the beginning, the defendants exhibited a sense of urgency and a willingness to help M.S. and the lactation consultant. They exchanged a series of emails with M.S. and the lactation consultant.

36. The person in charge of investigating this for the defendants acknowledged a daily round up of sites where the video was being shown. Many of the sites were removing the video. Some of the sites were not replying to the demand that the video be taken down or they were replacing the video but not changing any of the Meta data about the video.

37. M.S. asked defendants to make this a top priority.

38. By August 2010, however, defendants' interest in attempting to mitigate the damage caused to M.S. and A.S. started to wane. Over the next number of months, M.S. and the lactation consultant received only a couple of emails from the defendants relating to M.S. and A.S.'s situation.

39. Based upon information and belief, at or about this time, the defendants learned that it would be very difficult and quite costly to them to track down and shut down the creator of this video.

40. Only after M.S. secured counsel did defendants renew their interest in attempting to mitigate the damages.

41. Defendants offered to retain the services of a reputation management company to assist M.S. As it turns out, this is the company M.S. referred to the defendants' months ago.

In an attempt to mitigate the damages, M.S. has agreed to retain the services of this reputation management company.

42. The reputation company has advised M.S., however, that no matter what they do, they will not be able to completely eliminate the pornographic videos and/or pornographic links from the search engines.

43. Their goal will be to create positive content for M.S. so that the positive content will rank higher over the negative "scrapper" content on the search engines. It is more problematic and difficult, however, to create positive content for a child, especially a minor child. They will not be able to remove the negative content regarding the minor child off of the specific pornographic websites. The content will continue to re-circulate. The reputation company has warned that attempting to remove content in delicate situations like this usually results in the perpetrator(s) retaliating by posting more negative and reprehensible content.

44. The best they could do would be to push the negative content back on the search pages so that when a search is done, instead of the negative content showing up on the first or second page, it will show up on the third, fourth or fifth page.

45. Notwithstanding everyone's collective efforts, new links and new videos periodically resurface on the Internet linking M.S. and/or A.S. to pornography. For example:

(a) in July 2010, October 2010, November 2010, May 2011, July 2011, August 2011, and September 2011, new pornographic videos and/or links involving M.S. and A.S. have resurfaced on the Internet;

(b) as of July, 2011, there are still over thirty (30) links available on the Internet associating M.S. and A.S. with pornography;

      (c) the original breastfeeding/pornographic video was posted on You Tube in or about July 2010.  M.S.  attempted to have the video removed from You Tube, however, because she was not the copyright owner of the video with the proper supporting documentation to prove so, she did not have the legal authority to have the video removed, regardless of her efforts. You Tube, however, does maintain a comprehensive copyright infringement notification policy. She has repeatedly requested that Defendants have the video removed based upon an infringement of their copyright. Defendants either refused and/or could not get the video removed from You Tube. On August 30, 2011, the video was finally removed from You Tube after nearly 15,000 viewings. Less than twenty-four (24) hours after the removal, however, a new breastfeeding/pornographic video involving M.S. and A.S. was uploaded onto You Tube. As of September 6, 2011, over two thousand five hundred (2,500) people have already viewed the video;

      (d) On August 29, 2011, a Google search of A.S. revealed that the first two results on the first page of the search linked A.S. to a pornographic web site called wank.net. The link takes the viewer directly to the porn site offering the viewer an array of pornographic videos with titles such as Solo Babe "A.S.", Horney "A.S.", and many others;

      (e) M.S. maintained a Facebook account. Since she discovered the video, she has not used her full name while participating on Facebook. Notwithstanding, on August 23, 2011, Nizzard, the creator of the original breastfeeding/pornographic video, found her on Facebook and sent her a friend request. The request included a collage of photos, which included legitimate photos of M.S. breastfeeding A.S., and other pornographic photos, which appear to look like M.S., but are not her. Fearing for the safety and well being of her family, she frantically checked all of her family's privacy Facebook settings to ensure that the

perpetrator would not be able to connect any further and to make sure these photos could not be viewed by them or any of her Facebook connections. She also deleted her Facebook account and has not reactivated it since.

46. As a result of defendants' collective actions, M.S. and A.S. have been damaged and will continue to be damaged.

47. The fight to have her and her daughter's name cleared and her reputation restored as a result of the link with pornography, has interfered with M.S.'s profession, her personal life and overall well being.  A.S. is not even two (2) years old.  She will be faced with continuing damage as she engages in elementary school, middle school, high school and then college.  This may haunt her for years to come because what has occurred can never entirely be removed from the Internet.

48. What happened, especially to her daughter, A.S., and continues to happen, has caused M.S. humiliation, severe stress, anxiety, panic attacks, crying and shaking spells, vomiting, depression, sleeplessness, anger, sadness, and an unhealthy obsession with trying to clear her and her daughter's name.  Having been told that this will never completely go away has only made matters worse.

## FIRST COUNT

## (COMMON LAW FRAUD - MISREPRESENTATION)

49.  Plaintiffs repeat and re-allege all of the allegations contained in the Factual Allegations Common to All Counts as if same were set forth at length herein.

50.  Defendants made material representations of fact, specifically that they would not use the full name of either plaintiff in the filming, editing and production of the breastfeeding video, and that it would only be shown on cable TV and defendants' website.

51.  Defendants knew that these representations were false.

52.  In fact, the defendants used M.S.'s first and last name in the breastfeeding video and posted the video on You Tube.

53.  Defendants made these representations intending that plaintiffs rely on these representations.

54. Plaintiffs reasonably relied on the representations made by defendants.

55. As a result of defendants' misrepresentations, plaintiffs have been damaged.

WHEREFORE, plaintiffs, M.S. individually, and as guardian ad litem, for A.S., demand judgment against defendants, jointly, severally, and individually for the following:

　　A.  For compensatory damages.

　　B.  For punitive damages.

　　C.  For reasonable attorney fees.

　　D.  For such other and further relief that the court may deem just and equitable.

## SECOND COUNT

## (NEGLIGENT MISREPRESENTATION)

56. Plaintiffs repeat and re-allege all of the allegations contained in the Factual Allegations Common to All Counts and the First Count as if same were set forth at length herein.

57. Defendants negligently made incorrect statements of fact to the plaintiffs. They represented that the video would not include use of the first and last name of the plaintiffs and that it would only be shown on cable TV and their website. Those statements were incorrect. The defendants, in fact, used M.S.'s first and last name in the final video and posted the video on You Tube.

58. Plaintiffs justifiably relied upon the incorrect statements made by the defendants.

59. Plaintiffs sustained injury as a consequence of their reliance on the defendants' incorrect statements.

WHEREFORE, plaintiffs, M.S. individually, and as guardian ad litem, for A.S., demand judgment against defendants, jointly, severally, and individually for the following:

A. For compensatory damages.

B. For punitive damages.

C. For reasonable attorney fees.

D. For such other and further relief that the court may deem just and equitable.

## THIRD COUNT

## (NEGLIGENCE)

60.  Plaintiffs repeat and re-allege all of the allegations contained in the Factual Allegations Common to All Counts, the First Count and Second Count as if same were set forth at length herein.

61.  Defendants owed a duty to plaintiffs to exercise reasonable and ordinary care in the filming, editing, production and dissemination of the breastfeeding video.

62.  Defendants knew, or in the exercise of reasonable care, should have known, that the use of M.S.'s first and last name in the breastfeeding video could cause, and did, in fact, cause the plaintiffs' damage.

63.  Defendants knew, or in the exercise of reasonable care, should have known, that posting the breastfeeding video on You Tube without employing any types of protection in the downloading and use of the video, as they do in protecting the videos they have housed on their website, could cause, and in fact did cause, damage to the plaintiffs.

64. Defendants violated their duty to the plaintiffs in that the defendants negligently and carelessly included M.S.'s first and last name in the final video, which was presented to the public.

65.  This is especially true since it is defendants' own policy and procedure to not use the full name, first and last, of mothers and babies in the other institutional education videos including breastfeeding videos, that they produce and post on the website or on the internet.

66.  Defendants violated their duty to the plaintiffs by not taking reasonable steps to protect the videos posted on other internet websites as they do in protecting the videos they put on their own website.

67. As a direct and proximate result of the defendants' negligence, plaintiffs have suffered severe injury.

68. As a direct and proximate result of defendants' negligence, plaintiffs have been and will continue to be in great physical, mental, and emotional pain and distress, all to plaintiffs' damage.

WHEREFORE, plaintiffs, M.S. individually, and as guardian ad litem, for A.S., demand judgment against defendants, jointly, severally, and individually for the following:

A. For compensatory damages.

B. For punitive damages.

C. For reasonable attorney fees.

D. For such other and further relief that the court may deem just and equitable.

## **FOURTH COUNT**

## **(BREACH OF CONTRACT)**

69. Plaintiffs repeat and re-allege all of the allegations contained in the Factual Allegations Common to All Counts, the First Count, Second Count and Third Count as if same were set forth at length herein.

70. As a result of defendants' conduct described above, defendants breached their contract with the plaintiff.

71. As a result of defendants' breach, plaintiffs have been damaged.

WHEREFORE, plaintiffs, M.S. individually, and as guardian ad litem, for A.S., demand judgment against defendants, jointly, severally, and individually for the following:

A.  For compensatory damages.

B.  For punitive damages.

C.  For reasonable attorney fees.

D.  For such other and further relief that the court may deem just and equitable.

## **FIFTH COUNT**

## **(INVASION OF PRIVACY)**

72. Plaintiffs repeat and re-allege all of the allegations contained in the Factual Allegations Common to All Counts, the First Count, Second Count, Third Count and Fourth Count as if same were set forth at length herein.

73. As a result of defendants conduct described above, defendants have violated plaintiffs' privacy. Defendants used M.S.'s first and last name in their breastfeeding video for trade purposes.

74. M.S. did not consent to the use of her full name in the breastfeeding video.

75. As a result of defendants' invasion, plaintiffs have been damaged.

WHEREFORE, plaintiffs, M.S. individually, and as guardian ad litem, for A.S., demand judgment against defendants, jointly, severally, and individually for the following:

A. For compensatory damages.

B. For punitive damages.

C. For reasonable attorney fees.

D. For such other and further relief that the court may deem just and equitable.

## SIXTH COUNT

## (NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS)

76. Plaintiffs repeat and re-allege all of the allegations contained in the Factual Allegations Common to All Counts, the First Count, Second Count, Third Count, Fourth Count and Fifth Count as if same were set forth at length herein.

77. As a result of defendants' conduct described above, defendants owed a duty of reasonable care to the plaintiffs.

78. Defendants breached their duty to the plaintiffs.

79. As a result of defendants' breach of duty, plaintiff, M.S., has suffered severe emotional distress.

80. Defendants' breach was a proximate cause of plaintiff, M.S., injury.

WHEREFORE, plaintiffs, M.S. individually, and as guardian ad litem, for A.S., demand judgment against defendants, jointly, severally, and individually for the following:

A. For compensatory damages.

B. For punitive damages.

C. For reasonable attorney fees.

D. For such other and further relief that the court may deem just and equitable.

## SEVENTH COUNT

## (EQUITABLE FRAUD)

81.  Plaintiffs repeat and re-allege all of the allegations contained in the Factual Allegations Common to All Counts, the First Count, Second Count, Third Count, Fourth Count, Fifth Count and Sixth Count as if same were set forth at length herein.

82.  Defendants made material representations of fact, specifically that they would not use the full name of either plaintiff in the filming, editing and production of the breastfeeding video, and that it would only be shown on cable TV and defendants' website.

83.  In fact, the defendants used M.S.'s first and last name in the breastfeeding video and posted the video on You Tube.

84.  Defendants made these representations intending that plaintiffs rely on these representations.

85. Plaintiffs reasonably and detrimentally relied on the representations made by defendants.

86. As a result of defendants' misrepresentations, plaintiffs have been damaged.


WHEREFORE, plaintiffs, M.S. individually, and as guardian ad litem, for A.S., demand judgment against defendants, jointly, severally, and individually for the following:

A.  An order prohibiting the defendants from using the breastfeeding video featuring M.S. and A.S. for any purpose.

B.  For reasonable attorneys fees.

C.  For such other and further relief that the court may deem just and equitable.

## JURY DEMAND

Plaintiffs demand trial of all causes of action herein before a jury.

>                              RAMP & PISANI, LLP
>                              60 Westervelt Avenue
>                              P.O. Box 249
>                              Tenafly, New Jersey 07670
>                              fred@rampandpisani.com
>                              Attorneys for Plaintiffs

Dated: September 8, 2011           By:  s/ Fred J. Pisani
                                        Fred J. Pisani, Esq.