RAMP & PISANI, LLP
60 Westervelt Avenue
P.O. Box 249
Tenafly, New Jersey 07670
201-567-8877
fred@rampandpisani.com
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____

MARYANN SAHOURY, individually,
and as guardian ad litem,
For A.S.,

    Plaintiffs,      Civil Action No. 2:11-cv-05180-KSH-PS

  v.           PLAINTIFFS' SECOND AMENDED
              COMPLAINT AND JURY DEMAND

MEREDITH CORPORATION, MEREDITH
VIDEO STUDIOS and PARENTS TV,

    Defendants.
_____

  Plaintiffs, MaryAnn Sahoury, individually, and as guardian ad litem for A.S., residing in the Borough of Fair Lawn, County of Bergen, State of New Jersey, through their attorneys, Ramp & Pisani, LLP, complaining of the defendants, say:

## **JURISDICTION**

  The court has jurisdiction of this matter under 28 U.S.C. 1332 (Diversity), as well as pendent jurisdiction over the state law claims.

  The amount in controversy exceeds the sum of $75,000.00. Plaintiffs' damage claims include, but are not limited to, damage caused to their reputation, past, present and future,

damages for emotional distress, pain and suffering, and out of pocket expenses. In the complaint, plaintiffs also seek punitive damages and an award of reasonable attorneys fees.

**FACTUAL ALLEGATIONS COMMON TO ALL COUNTS**

1. Defendant, Meredith Corporation (hereinafter referred to as "Meredith"), is one of the nation's leading media and marketing companies with businesses centering on magazines (Better Homes & Gardens, Family Circle, and Parents), book publishing, television broadcasting, integrated marketing and interactive media.  Meredith maintains headquarters in Des Moines, Iowa.  Meredith proclaims that for nearly a century Meredith brands have been committed to providing women with information and inspiration to create a rich and meaningful life.

2. One of Meredith's brands is Parents®, which operates defendant, Parent.tv.

3. Defendant, Meredith Video Studios (hereinafter referred to as "Meredith Video"), is owned and operated by Meredith and is a full service video development, production and multi-platform distribution company.  One of their platforms is Parents TV who provides video on demand via mobile and cable TV.

4. Meredith Video main headquarters is located in Des Moines, Iowa.  They also maintain corporate offices in New York, Illinois and California.

5. In March, 2009, MaryAnn Sahoury ( hereinafter referred to as "MaryAnn"), became pregnant for the first time.

6. MaryAnn was interested in breastfeeding her child when she gave birth.  As are many first-time mothers, she was apprehensive and uncertain whether she would be able to successfully breastfeed her child.

7. During the course of her pregnancy, she retained a professional lactation consultant to assist her in alleviating her fears and concerns about breastfeeding.

8. Through a series of innovative classes, training methods and parenting techniques, the lactation consultant educated, empowered and inspired MaryAnn to attempt breastfeeding.

9. Shortly thereafter, on December 9, 2009, MaryAnn gave birth to a beautiful and wonderful little girl, who she named A.S.

10. MaryAnn began to breastfeed A.S. with the lactation consultant monitoring Mary Ann's progress. Although there were difficulties along the way, MaryAnn was able to overcome them and successfully breastfeed A.S.

11. Thereafter, the lactation consultant approached MaryAnn and told her that she was engaged by Parents TV to appear in an educational/instructional breastfeeding video. The lactation consultant advised Parents TV that she thought MaryAnn, and her beautiful daughter, A.S., would be perfect candidates to appear in the video because she believed MaryAnn was a testament to how a first-time mother could overcome her fears and successfully breastfeed a child.

12. After some serious trepidation, MaryAnn advised the lactation consultant that she would be interested in participating in the breastfeeding video because she felt her own personal experience would be insightful and helpful to other first-time mothers who are considering breastfeeding.

13. On or about January 8, 2010, MaryAnn, along with her daughter, A.S., traveled, in a snowstorm, to the New Jersey home of the lactation consultant.

14. Upon arrival, MaryAnn and the lactation consultant met with a woman in charge of the video shoot, whom MaryAnn believes was the producer. Since both MaryAnn and the

lactation consultant were participating in an educational, instructional video with Parents TV for the first time, they wanted to know the process and Parents TV's intentions with regard to the filming and use of the video. The woman in charge of the video production specifically represented to both, MaryAnn and the lactation consultant, that the finished video would not disclose, either audibly or visually, the full name (first and last) of either MaryAnn and/or A.S. She also represented that the breastfeeding video would be used for educational and instructional purposes only and that the video would be shown on their website and cable TV.

15. Based on these representations, MaryAnn, on behalf of herself and her daughter, A.S., agreed to participate in the breastfeeding video. MaryAnn participated in the breastfeeding video without seeking compensation, celebrity status or publicity.

16. The video shoot took place at the lactation consultant's New Jersey home and lasted from the morning until early afternoon. During the video shoot, MaryAnn answered a series of questions and demonstrated breastfeeding A.S. After the video shoot with MaryAnn and her daughter, the defendants did a second breastfeeding video at the lactation consultant's home that same day, with the same producer and the same cameraman.

17. After the shoot was complete, MaryAnn packed up A.S. in her car seat and was about to leave the premises. The woman in charge told MaryAnn that she had to sign a piece of paper that was on a kitchen counter top. She asked MaryAnn to sign the paper on behalf of herself and A.S. She did not ask MaryAnn to read it first before she signed it. She did not advise MaryAnn that she should have an attorney review it before she signed it. She did not explain to MaryAnn the content of the paper. MaryAnn believed that she was signing a paper, which confirmed what had been represented to her in the morning before the shoot.

18. Without reading or reviewing the paper, she signed the paper.

19. Months went by and no one had contacted MaryAnn about the airing of the video. MaryAnn has previously worked in public relations for all types of companies. As a result, she occasionally searched her name and the companies she worked for, through the Google search engine.

20. In early July 2010, she decided to Google her name. When she typed in her full name, she was horrified to view what the Google search revealed. The first page of the search revealed link after link linking her name to pornography and pornographic websites.

21. When she investigated further, she discovered that the links brought you to a video, which combined actual footage from the breastfeeding video with pornographic video using a woman with similar features and stature to MaryAnn. Based upon information and belief, it appears that the creator of this video spliced pornographic video with live footage from the breastfeeding video. Reading the links and watching the video would have the viewer believe that it was MaryAnn in both the breastfeeding video and the pornographic video. The same video also contained footage of MaryAnn's minor daughter. The links connect A.S. to pornography.

22. MaryAnn was mortified and shocked to learn that the defendants filmed, edited, and produced the breastfeeding video using MaryAnn's first and last name, contrary to the representations made to Mary Ann before the video shoot.

23. Had the defendants not used MaryAnn's last name, the creator of the pornographic video would not have been able to link up the breastfeeding video and the pornographic video with MaryAnn and A.S. connecting both of them to pornography.

24. Defendants' use of the first and last name of MaryAnn in the breastfeeding video was contrary to the explicit representation made to MaryAnn prior to the shoot.

25. Defendants did not disclose the full name of other mothers and babies participating in their other institutional and educational videos, including other breastfeeding videos, which were available for viewing on the Internet during this time frame, including the second breastfeeding video defendants did the same day as MaryAnn's at the same location, with the same producer and cameraman.

26. MaryAnn also later discovered that defendants' breastfeeding video had been posted on You Tube.  The posting on You Tube was contrary to the explicit representation made to her prior to the shoot.  Based upon information and belief, Parents TV prevents downloading of breastfeeding videos and other institutional and educational videos from its website.  Parents TV, however, does not attempt to prevent downloading of its breastfeeding videos and/or other institutional or educational videos, which it posts on You Tube. Defendants had a commercial purpose in posting this video on You Tube. Large companies like defendant post video on You Tube because they want to attract a large audience who will watch the video. Their video is embedded with their corporate logo and guides, suggests, or promotes viewers to go to their website. If the viewer is interested in the video they watch, they can go to defendants' website to view similar videos and or purchase services or product from the defendants. In addition, defendants can charge companies who advertise on their website more advertising fees depending on the traffic defendants get to their website. As a result, the You Tube posting creates an additional revenue stream for defendants.

27. MaryAnn immediately notified defendants and the lactation consultant as soon as she discovered these horrific links and video. Prior to the original breastfeeding video being released, defendants' producer called the lactation consultant and asked her to verify MaryAnn's name, and asked if there was a space between Mary and Ann.

When the lactation consultant found out about that the breastfeeding video had been converted into a breastfeeding/pornographic video, she called the defendants' producer and asked her why they had used plaintiffs' first and last name in the video. The producer responded that she did not know and that she would have to look into it because it was not something that they do.

28.  Subsequently, MaryAnn spent countless hours and sleepless nights trying to identify and report the websites, links and users of this spliced breastfeeding/pornographic video.  As of the middle of July 2010, search engines, such as Google and Yahoo, link and associate MaryAnn and her daughter, A.S. with pornography and pornographic sites and in other sexual negative contexts.  The lactation consultant also spent countless hours trying to assist Mary Ann in her quest to repair her and her daughter's damaged reputation.

29.  MaryAnn was initially successful in having some of the videos removed, but the links with the verbiage linking her and her daughter's name with sexual comments and pornography remained.

30.  MaryAnn became consumed with looking each and every day and into the night to see what else would show up on the Internet.  It took a tremendous emotional toll on her.

31.  Due to her tireless efforts, MaryAnn provided the lead to who may have been the main perpetrator in creating the doctored video.

32.  The lactation consultant and her husband followed MaryAnn's lead and uncovered who the possible perpetrator was.  He was identified as an individual named "Nizarddd". This individual reposted the video back on You Tube, six months ago. Defendants have made no effort to monitor him or have him shut down.

33. MaryAnn engaged in a campaign and relentless effort to shut down this perpetrator.

34. MaryAnn found out that there are companies who specialize in reputation management.

35. MaryAnn and the lactation consultant passed along all of the information they were able to find to the defendants. In the beginning, the defendants exhibited a sense of urgency and a willingness to help MaryAnn and the lactation consultant. They exchanged a series of emails with MaryAnn and the lactation consultant.

36. The person in charge of investigating this for the defendants acknowledged a daily round up of sites where the video was being shown. Many of the sites were removing the video. Some of the sites were not replying to the demand that the video be taken down or they were replacing the video but not changing any of the Meta data about the video.

37. MaryAnn asked defendants to make this a top priority.

38. By August 2010, however, defendants' interest in attempting to mitigate the damage caused to MaryAnn and A.S. started to wane. Over the next number of months, Mary Ann and the lactation consultant received only a couple of emails from the defendants relating to MaryAnn's and A.S.'s situation.

39. Based upon information and belief, at or about this time, the defendants learned that it would be very difficult and quite costly to them to track down and shut down the creator of this video.

40. Only after MaryAnn secured counsel did defendants renew their interest in attempting to mitigate the damages.

41. Defendants offered to retain the services of a reputation management company to assist MaryAnn. As it turns out, this is the company MaryAnn referred to the defendants' months ago. In an attempt to mitigate the damages, MaryAnn has agreed to retain the services of this reputation management company.

42. The reputation company has advised MaryAnn, however, that no matter what they do, they will not be able to completely eliminate the pornographic videos and/or pornographic links from the search engines.

43. Their goal will be to create positive content for MaryAnn so that the positive content will rank higher over the negative "scrapper" content on the search engines. It is more problematic and difficult, however, to create positive content for a child, especially a minor child. They will not be able to remove the negative content regarding the minor child off of the specific pornographic websites. The content will continue to re-circulate. The reputation company has warned that attempting to remove content in delicate situations like this usually results in the perpetrator(s) retaliating by posting more negative and reprehensible content.

44. The best they could do would be to push the negative content back on the search pages so that when a search is done, instead of the negative content showing up on the first or second page, it will show up on the third, fourth or fifth page.

45. Notwithstanding everyone's collective efforts, new links and new videos periodically resurface on the Internet linking MaryAnn and/or A.S. to pornography. For example:

(a) in July 2010, October 2010, November 2010, May 2011, July 2011, August 2011, and September 2011, new pornographic videos and/or links involving MaryAnn and A.S. have resurfaced on the Internet;

(b) as of July, 2011, there are still over thirty (30) links available on the Internet associating MaryAnn and A.S. with pornography;

(c) the original breastfeeding/pornographic video was posted on You Tube in or about July 2010. MaryAnn attempted to have the video removed from You Tube, however, because she was not the copyright owner of the video with the proper supporting documentation to prove so, she did not have the legal authority to have the video removed, regardless of her efforts. You Tube, however, does maintain a comprehensive copyright infringement notification policy. She has repeatedly requested that Defendants have the video removed based upon an infringement of their copyright. Defendants either refused and/or could not get the video removed from You Tube. On August 30, 2011, the video was finally removed from You Tube after nearly 15,000 viewings. Less than twenty-four (24) hours after the removal, however, a new breastfeeding/pornographic video involving MaryAnn and A.S. was uploaded onto You Tube. As of September 6, 2011, over two thousand five hundred (2,500) people have already viewed the video.

(d) On August 29, 2011, a Google search of A.S. revealed that the first two results on the first page of the search linked A.S. to a pornographic web site called wank.net. The link takes the viewer directly to the porn site offering the viewer an array of pornographic videos with titles such as Solo Babe "A.S.", Horney "A.S.", and many others;

(e) MaryAnn maintained a Facebook account. Since she discovered the video, she has not used her full name while participating on Facebook. Notwithstanding, on August 23, 2011, Nizzard, the creator of the original breastfeeding/pornographic video, found her on Facebook and sent her a friend request. The request included a collage of photos, which included legitimate photos of MaryAnn breastfeeding A.S., and other pornographic photos,

which appear to look like MaryAnn, but are not her. Fearing for the safety and well being of her family, she frantically checked all of her family's privacy Facebook settings to ensure that the perpetrator would not be able to connect any further and to make sure these photos could not be viewed by them or any of her Facebook connections. She also deleted her Facebook account and has not reactivated it since.

46. As a result of defendants' collective actions, MaryAnn and A.S. have been damaged and will continue to be damaged.

47. The fight to have her and her daughter's name cleared and her reputation restored as a result of the link with pornography, has interfered with MaryAnn's profession, her personal life and overall well being.  A.S. is not even two (2) years old.  She will be faced with continuing damage as she engages in elementary school, middle school, high school and then college.  This may haunt her for years to come because what has occurred can never entirely be removed from the Internet.

48. What happened, especially to her daughter, A.S., and continues to happen, has caused MaryAnn humiliation, severe stress, anxiety, panic attacks, crying and shaking spells, vomiting, depression, sleeplessness, anger, sadness, and an unhealthy obsession with trying to clear her and her daughter's name.  Having been told that this will never completely go away has only made matters worse.

## FIRST COUNT

## (COMMON LAW FRAUD - MISREPRESENTATION)

49. Plaintiffs repeat and re-allege all of the allegations contained in the Factual Allegations Common to All Counts as if same were set forth at length herein.

50. Defendants made material representations of fact, specifically that they would not use the full name of either plaintiff in the filming, editing and production of the breastfeeding video, and that it would only be shown on cable TV and defendants' website.

51. Defendants knew that these representations were false.

52. In fact, the defendants used MaryAnn's first and last name in the breastfeeding video and posted the video on You Tube.

53. Defendants made these representations intending that plaintiffs rely on these representations.

54. Plaintiffs reasonably relied on the representations made by defendants.

55. As a result of defendants' misrepresentations, plaintiffs have been damaged.

WHEREFORE, plaintiffs, MaryAnn Sahoury, individually, and as guardian ad litem, for A.S., demand judgment against defendants, jointly, severally, and individually for the following:

    A. For compensatory damages.

    B. For punitive damages.

    C. For reasonable attorney fees.

    D. For such other and further relief that the court may deem just and equitable.

## SECOND COUNT

## (NEGLIGENT MISREPRESENTATION)

56. Plaintiffs repeat and re-allege all of the allegations contained in the Factual Allegations Common to All Counts and the First Count as if same were set forth at length herein.

57. Defendants negligently made incorrect statements of fact to the plaintiffs. They represented that the video would not include use of the first and last name of the plaintiffs and that it would only be shown on cable TV and their website. Those statements were incorrect. The defendants, in fact, used MaryAnn's first and last name in the final video and posted the video on You Tube.

58. Plaintiffs justifiably relied upon the incorrect statements made by the defendants.

59. Plaintiffs sustained injury as a consequence of their reliance on the defendants' incorrect statements.

WHEREFORE, plaintiffs, MaryAnn Sahoury, individually, and as guardian ad litem, for A.S., demand judgment against defendants, jointly, severally, and individually for the following:

    A.  For compensatory damages.

    B.  For punitive damages.

    C.  For reasonable attorney fees.

    D.  For such other and further relief that the court may deem just and equitable.

## THIRD COUNT

## (NEGLIGENCE)

60. Plaintiffs repeat and re-allege all of the allegations contained in the Factual Allegations Common to All Counts, the First Count and Second Count as if same were set forth at length herein.

61. Defendants owed a duty to plaintiffs to exercise reasonable and ordinary care in the filming, editing, production and dissemination of the breastfeeding video.

62. Defendants knew, or in the exercise of reasonable care, should have known, that the use of Mary Ann's first and last name in the breastfeeding video could cause, and did, in fact, cause the plaintiffs' damage.

63. Defendants knew, or in the exercise of reasonable care, should have known, that posting the breastfeeding video on You Tube without employing any types of protection in the downloading and use of the video, as they do in protecting the videos they have housed on their website, could cause, and in fact did cause, damage to the plaintiffs.

64. Defendants violated their duty to the plaintiffs in that the defendants negligently and carelessly included MaryAnn's first and last name in the final video, which was presented to the public.

65. This is especially true since it is defendants' own policy and procedure to not use the full name, first and last, of mothers and babies in the other institutional education videos including breastfeeding videos, that they produce and post on the website or on the internet.

66. Defendants violated their duty to the plaintiffs by not taking reasonable steps to protect the videos posted on other internet websites as they do in protecting the videos they put on their own website.

67. As a direct and proximate result of the defendants' negligence, plaintiffs have suffered severe injury.

68. As a direct and proximate result of defendants' negligence, plaintiffs have been and will continue to be in great physical, mental, and emotional pain and distress, all to plaintiffs' damage.

WHEREFORE, plaintiffs, MaryAnn Sahoury, individually, and as guardian ad litem, for A.S., demand judgment against defendants, jointly, severally, and individually for the following:

 A. For compensatory damages.

 B. For punitive damages.

 C. For reasonable attorney fees.

 D. For such other and further relief that the court may deem just and equitable.

## FOURTH COUNT

## (BREACH OF CONTRACT)

69. Plaintiffs repeat and re-allege all of the allegations contained in the Factual Allegations Common to All Counts, the First Count, Second Count and Third Count as if same were set forth at length herein.

70. As a result of defendants' conduct described above, defendants breached their contract with the plaintiff.

71. As a result of defendants' breach, plaintiffs have been damaged.

WHEREFORE, plaintiffs, MaryAnn Sahoury, individually, and as guardian ad litem, for A.S., demand judgment against defendants, jointly, severally, and individually for the following:

A. For compensatory damages.

B. For punitive damages.

C. For reasonable attorney fees.

D. For such other and further relief that the court may deem just and equitable.

## FIFTH COUNT

## (INVASION OF PRIVACY)

### Right of Publicity

72. Plaintiffs repeat and re-allege all of the allegations contained in the Factual Allegations Common to All Counts, the First Count, Second Count, Third Count and Fourth Count as if same were set forth at length herein.

73. As a result of defendants conduct described above, defendants have violated plaintiffs' privacy. Defendants used MaryAnn's first and last name in their breastfeeding video for trade purposes. Defendants appropriated for their own use and/or benefit the plaintiffs' names.

74. MaryAnn did not consent to the use of her full name in the breastfeeding video.

75. As a result of defendants' invasion, plaintiffs have been damaged.

WHEREFORE, plaintiffs, MaryAnn Sahoury, individually, and as guardian ad litem, for A.S., demand judgment against defendants, jointly, severally, and individually for the following:

    A. For compensatory damages.

    B. For punitive damages.

    C. For reasonable attorney fees.

    D. For such other and further relief that the court may deem just and equitable.

## SIXTH COUNT

## (NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS)

76. Plaintiffs repeat and re-allege all of the allegations contained in the Factual Allegations Common to All Counts, the First Count, Second Count, Third Count, Fourth Count and Fifth Count as if same were set forth at length herein.

77. As a result of defendants' conduct described above, defendants owed a duty of reasonable care to the plaintiffs.

78. Defendants breached their duty to the plaintiffs.

79. As a result of defendants' breach of duty, plaintiff, MaryAnn Sahoury, has suffered severe emotional distress.

80. Defendants' breach was a proximate cause of plaintiff, MaryAnn Sahoury, injury.

WHEREFORE, plaintiffs, MaryAnn Sahoury, individually, and as guardian ad litem, for A.S., demand judgment against defendants, jointly, severally, and individually for the following:

    A.  For compensatory damages.

    B.  For punitive damages.

    C.  For reasonable attorney fees.

    D.  For such other and further relief that the court may deem just and equitable.

## SEVENTH COUNT

## (EQUITABLE FRAUD)

81. Plaintiffs repeat and re-allege all of the allegations contained in the Factual Allegations Common to All Counts, the First Count, Second Count, Third Count, Fourth Count, Fifth Count and Sixth Count as if same were set forth at length herein.

82. Defendants made material representations of fact, specifically that they would not use the full name of either plaintiff in the filming, editing and production of the breastfeeding video, and that it would only be shown on cable TV and defendants' website.

83. In fact, the defendants used MaryAnn's first and last name in the breastfeeding video and posted the video on You Tube.

84. Defendants made these representations intending that plaintiffs rely on these representations.

85. Plaintiffs reasonably and detrimentally relied on the representations made by defendants.

86. As a result of defendants' misrepresentations, plaintiffs have been damaged.

WHEREFORE, plaintiffs, MaryAnn Sahoury, individually, and as guardian ad litem, for A.S., demand judgment against defendants, jointly, severally, and individually for the following:

A. An order prohibiting the defendants from using the breastfeeding video featuring MaryAnn Sahoury and A.S. for any purpose.

B. For reasonable attorneys fees.

C. For such other and further relief that the court may deem just and equitable.

## JURY DEMAND

Plaintiffs demand trial of all causes of action herein before a jury.

                                               RAMP & PISANI, LLP
                                               60 Westervelt Avenue
                                               P.O. Box 249
                                               Tenafly, New Jersey 07670
                                               fred@rampandpisani.com
                                               Attorneys for Plaintiffs


Dated: November 11, 2011                 \_\_\_\_s/Fred J. Pisani_____
                                                         By: Fred J. Pisani, Esq.