NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

MARYANN SAHOURY, individually, and as guardian ad litem for A.S.,

        *Plaintiffs*,

v.

MEREDITH CORPORATION, MEREDITH VIDEO STUDIOS and PARENT TV,

        *Defendants*.

Civ. Action No. 11-5180 (KSH)

OPINION

**Katharine S. Hayden, U.S.D.J.**

    This matter comes before the Court on the motion of defendants Meredith Corporation, Meredith Video Studios, and Parent TV to dismiss plaintiffs' complaint for failure to state a claim. Plaintiff MaryAnn Sahoury, individually and on behalf of her daughter A.S., brought this action after she participated in an instructional video that was filmed, produced, and disseminated by defendants. The video was posted on the internet and subsequently "stolen" by a third party (not involved in this lawsuit), who used the footage to create pornographic videos titled with Sahoury and A.S.'s names. For the reasons set forth below, the motion to dismiss will be granted in part and denied in part.

    **I. Factual Background**

    Meredith Corporation ("Meredith") is a media and marketing company that engages in book and magazine publishing, television broadcasting, integrated marketing, and interactive media. (Second Amended Compl. ("SAC") ¶ 1.) One of Meredith's brands is Parents®, which

operates Parents TV. (*Id.* ¶ 2.)  Meredith Video Studios, owned and operated by Meredith, is a full service video development, production, and multi-platform distribution company. (*Id.* ¶ 3.) One of its platforms is Parents TV, which provides video on demand via mobile and cable TV. (*Id.*)

In 2009, Sahoury, who was expecting her first child, retained a lactation consultant, Shari Criso, to assist her in overcoming her fears about breastfeeding.  (*Id.* ¶¶ 6–7.)  After her daughter A.S. was born, Sahoury began breastfeeding with the Criso's help. (*Id.* ¶¶ 9–10.)  When Parents TV invited Criso to appear in an educational/instructional breastfeeding video, she asked Sahoury to appear in the video with her infant daughter "as a testament to how a first-time mother could overcome her fears and successfully breastfeed a child." (*Id.* ¶ 11.)  Sahoury had some concerns, but she agreed to appear in the video "because she felt her own personal experience would be insightful and helpful to other first-time mothers who are considering breastfeeding." (*Id.* ¶ 12.)

On January 8, 2010, Sahoury and A.S., who was a month old, went to Criso's home to film the video, which was called *Breastfeeding Help*. (*Id.* ¶ 13.)  Before filming began, Sahoury and Criso questioned the producer about the "process and Parents TV's intentions with regard to the filming and use of the video." (*Id.* ¶ 14.)  Sahoury alleges that

> [t]he woman in charge of the video production specifically represented . . . that the finished video would not disclose, either audibly or visually, the full name (first and last) of either [Sahoury] and/or A.S. She also represented that the breastfeeding video would be used for educational and instructional purposes only and that the video would be shown on their website and cable TV.

(*Id.*)  Based on these representations Sahoury agreed to participate.  (*Id.* ¶ 15.)

During the filming Sahoury was asked questions about her experience learning to breastfeed her daughter and she demonstrated breastfeeding techniques. (*Id.* ¶ 16.)  A second

video with another new mother was being shot at Criso's home directly afterwards, with the same producer and cameraman. (*Id.*) When Sahoury's shoot was finished and she began packing up A.S. to leave, she was instructed by the producer that she must sign a document that was on the kitchen counter. (*Id.* ¶ 17.) In a hurry to leave and believing the document confirmed what the producer had told her, Sahoury signed without reading it. (*Id.* ¶¶ 17–18.)

Sahoury learned later that what she signed was an "Authorization & Full Release" ("Release"), which purports to release defendants from "any and all claims which the Undersigned may have at any time by reason of the use of the Undersigned's image, voice and name as contemplated herein, including without limitation, claims of privacy." (Aff. Michael Knott, Ex. B, Authorization & Full Release.) Also, the Release "authorizes [defendants] . . . to copyright, use, exhibit, transmit, broadcast and/or publish, and license and/or sublicense on a world-wide basis . . . any film/videotape, tape, audio recordings, footage, photographs, negatives, reproductions and/or otherwise of Undersigned's image and voice (referred to as 'Recorded Likeness')," and states that "the Undersigned also consents to the use of the Undersigned's name in connection with the Recorded Likeness." (*Id.*)

Months went by after *Breastfeeding Help* was filmed, during which Sahoury heard nothing about when the video would be aired. (SAC ¶ 19.) Because she had previously worked in public relations, Sahoury occasionally searched her name on Google. (*Id.*) In July of 2010, Sahoury typed her first and last name into Google and was horrified when the search revealed a number of links to pornographic websites and videos that included her name. (*Id.*) A search of A.S.'s full name also brought up pornographic links. (*Id.* ¶¶ 19, 45(a), (d).) Upon investigating further, Sahoury discovered that the links were to a pornographic video that combined footage from the *Breastfeeding Help* video (including footage of A.S.) with pornographic scenes

3

featuring a woman "with similar features and stature." (*Id.*)  Reviewing the pornographic video, Sahoury realized that the *Breastfeeding help* video had used her first and last name and her daughter's first name. (*Id.* ¶ 22; Aff. Michael Knott, Ex. A, *Breastfeeding Help* video.)  The complaint alleges that the use of Sahoury's full name was "contrary to the representations made to [her] before the video shoot," and had defendants not scrolled it across the screen, "the creator of the pornographic video would not have been able to link up the breastfeeding video and the pornographic video with [Sahoury] and A.S. connecting them both to pornography." (SAC ¶¶ 22–23.)

According to the complaint, defendants did not disclose the names of other mothers and babies participating in their videos, including the second breastfeeding video filmed the same day as *Breastfeeding Help* at the same location, with the same producer and cameraman. (*Id.* ¶ 25.)  Sahoury also discovered that the *Breastfeeding Help* video had been posted on YouTube by defendants, whereas she had been told it would only appear on the Parents® website and cable TV.  The complaint alleges that defendants took no steps to prevent videos they posted to YouTube from being downloaded by third parties. (*Id.* ¶ 26.)

Sahoury immediately informed defendants and Criso about the pornographic links and video she had discovered. (*Id.* ¶ 27.)  She spent "countless hours" trying to identify and report websites, links and users of the pornographic content in an effort to repair her and her daughter's reputations. (*Id.* ¶ 28.)  With Criso's help, she found out that an individual named "Nizard" had made the original video. (*Id.* ¶ 32.)

Initially defendants "exhibited a sense of urgency and a willingness" to help Sahoury track Nizard down and remove pornographic content. (*Id.* ¶¶ 35–36.)  But by August of 2010, their interest appeared to wane and Sahoury hired counsel. (*Id.* ¶¶ 38–40.)  Defendants then

offered to retain the services of a reputation management company, which advised Sahoury that it would create positive content that would rank higher in search engine results than the pornographic content. The company told Sahoury that it could not completely eliminate the pornographic links and videos from the internet. (*Id.* ¶¶ 42–43.)

New links and videos associating both Sahoury and A.S. with pornography continue to resurface. (*Id.* ¶ 45.) The complaint asserts that Sahoury has suffered "humiliation, severe stress, anxiety, panic attacks, crying and shaking spells, vomiting, depression, sleeplessness, anger, sadness, and an unhealthy obsession with trying to clear her and her daughter's name." (*Id.* ¶ 48.)

## II. Jurisdiction

Because the Court hears this case pursuant to its diversity jurisdiction, 28 U.S.C. § 1332, it must apply state substantive law and federal procedural law. *Gasperini v. Ctr. for Humanities*, 518 U.S. 415, 427 (1996) ("Under the Erie doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law."). The parties agree this dispute is governed by New Jersey law.

## III. Standard of Review

Pursuant to Fed. R. Civ. P. 8(a)(2) "[a] pleading that states a claim for relief . . . must contain a short and plain statement of the claim showing that the pleader is entitled to relief." The pleading must "set out sufficient factual matter to show that the claim is facially plausible" so that a court may "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (internal quotations omitted). This standard "does not require 'detailed factual allegations,' but it demands more than

5

an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

To survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Plaintiff need not meet any particular "probability requirement" but must show that there is "more than a sheer possibility that defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). Moreover, "[c]ontext matters in notice pleading" and a complaint will fail to state a claim if the "factual detail in a complaint is so underdeveloped that it does not provide a defendant with the type of notice of claim which is contemplated by Rule 8." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008).

When presented with a motion to dismiss, courts should engage in a two-part analysis. *Fowler*, 578 F.3d at 210. First, the court must separate the factual and legal elements of each claim. *Id.* It "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Id.* at 210–11 (citing *Iqbal*, 556 U.S. at 667). Second, the court must determine whether the facts alleged are "sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 579). The plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 579. In other words, for the plaintiff to prevail, the

"complaint must do more than allege the plaintiff's entitlement to relief"; it must "'show' such an entitlement with its facts." *Fowler*, 578 F.3d at 211(citing *Phillips*, 515 F.3d at 234–35).

Finally, although the plain language of Rule 12(b) provides that if matters outside the pleading are considered on a 12(b)(6) motion, the motion is converted into a Rule 56 motion for summary judgment, the Third Circuit and "other courts of appeals have held that a court may consider certain narrowly defined types of material without converting the motion to dismiss." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Specifically, a court can consider a "document integral to or explicitly relied upon in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

Here, defendants have attached the Release and a copy of *Breastfeeding Help*. Because these materials are the basis of Sahoury's claims, the Court will consider them, recognizing that this does not convert the motion to one for summary judgment. For her part, Sahoury has submitted an affidavit from Shari Criso, and a copy of a pornographic video that includes footage from *Breastfeeding Help*. However, accepting the facts alleged in the complaint as true, the court need not consider the pornography. It is not the basis of the Sahoury's claims. Rather, it demonstrates the damage to her and her daughter. The Court finds that the Criso affidavit goes beyond the four corners of the pleadings by providing evidentiary support for the facts pleaded therein, and accordingly will not consider it.

## IV. Analysis

### A. The complaint adequately states a claim for fraudulent misrepresentation, negligent misrepresentation, and equitable fraud

Sahoury has made sufficient factual allegations, accepted as true, to demonstrate plausible claims for fraudulent misrepresentation, ie. fraud in the inducement, equitable fraud, or alternatively negligent misrepresentation.

To state a claim for fraudulent misrepresentation or fraud in the inducement, a plaintiff must show "'(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages.'" *Banco Popular N. Am. v. Gandi,* 184 N.J. 161, 172–73 (2005) (quoting *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997)). Where a plaintiff claims equitable fraud, she need only demonstrate that (1) there was a material misrepresentation of a presently existing or past fact; (2) plaintiff reasonably relied on the misrepresentation; and (3) the plaintiff was damaged as a result. *See Jewish Ctr. of Sussex Cty. v. Whale,* 86 N.J. 619, 624–25 (1981). "The elements of scienter, that is, knowledge of the falsity and an intention to obtain an undue advantage therefrom, are not essential if plaintiff seeks to prove that a misrepresentation constituted only equitable fraud." *Id.*

Similarly, to make out a claim for negligent misrepresentation one must show that the defendant negligently provided false information upon which the plaintiff justifiably relied and was damaged as a result. *Karu v. Feldman,* 119 N.J. 135, 146–47 (1990). "The element of reliance is the same for fraud and negligent misrepresentation." *Kaufman v. i-Stat Corp.,* 165 N.J. 94, 109 (2000).

Sahoury alleges that the video producer represented to her, either intentionally or negligently, that only first names would be used in *Breastfeeding Help*, and further, that the video would only be shown on the Parents® website and cable television. Sahoury contends she reasonably relied on these representations in choosing to participate in the video and demonstrate breastfeeding on film. She also signed the Release at the request of the producer, admittedly without reading it, because she believed it to reiterate what had already been represented to her. She further alleges that her reliance on the producer's statements was detrimental to her and A.S.

8

because defendants posted the video to YouTube with Sahoury's full name on the screen. Defendants' use of Sahoury's full name and their choice to make the video available on YouTube made it possible for a third party to download the video and combine footage of Sahoury breastfeeding A.S. with pornographic content, thereby creating videos that associate Sahoury and her daughter with internet pornography.

These facts, accepted as true, establish that Sahoury is entitled to relief. First, Fed. R. Civ. P. 8(d)(2)–(3) states that a plaintiff may plead claims for relief in the alternative. Here, discovery will further develop whether defendants made a misrepresentation of fact and, if so, whether it was intentional or negligent. At this stage, the facts pleaded demonstrate that either is plausible. Moreover, in pleading fraud "a party must state with particularity the circumstances of the fraud" but "[m]alice, intent, knowledge and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Sahoury has done that here. She pleaded, with particularity, the exact misrepresentation of fact she claims induced her to participate in the video and sign the release, while alleging generally that the misrepresentation was made knowingly and with the intent that she rely upon it. Sahoury has moved these claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

Defendants argue that Sahoury has failed to state a claim because she cannot prove she "reasonably relied" on the misrepresentation. (Defs.' Br. 7–11.) Specifically, defendants argue that the Release Sahoury signed states that she "consent[ed] to use of [her and her daughter's] name in connection with the Recorded Likeness," and authorized defendants to use her recorded likeness "in any medium whatsoever (now existing or hereinafter created)." (Defs.' Br. 11; Aff. Michael Knott Aff., Ex. B.) Defendants argue that because the prior oral statements "contradict" the written contract, Sahoury could not have reasonably relied on them. Such a conclusion

9

cannot be reached on the facts available at the pleading stage. The order of events alone precludes that—Sahoury alleges that the video was complete and she was rushing to get home with her infant before the Release was called to her attention and she was told to sign it.

Defendants further argue the entire complaint is barred by the language of the Release, which states that upon signing, Sahoury "release[d] [defendants] . . . from any and all claims which [Sahoury] may have at any time by reason of the use of [her or her daughter's] image, voice, and name as contemplated herein, including without limitation claims of privacy." (Aff. Michael Knott, Ex. B.) While this argument serves as a defense to the claims made in the complaint, Sahoury has plausibly pleaded fraud in the inducement, which if successful will render the Release unenforceable.

Generally, defendants' reliance on the Release as a reason to dismiss the complaint misses the point that "standards of pleading are not the same as standards of proof." *Fowler,* 578 F.3d at 214 (citing *Phillips,* 515 F.3d at 246). Under the proper analysis, the first, second and seventh counts—fraudulent misrepresentation, negligent misrepresentation and equitable fraud respectively—state plausible claims for relief. The motion to dismiss as to these claims is denied.

### B. The complaint states a plausible claim for breach of contract.

Count four of the complaint alleges that defendants represented that they would only use first names in the video and thus they breached the terms of the Release when Sahoury's full name appeared on the screen in *Breastfeeding Help*. Accepting the factual allegations as true, this is a plausible claim for breach of contract. Defendants argue, however, that the claim fails as a matter of law because the signed Release permitted them to use the names and recorded

likenesses of Sahoury and A.S., and therefore their actions did not breach the contract. (Defs.' Br. 11–12.)

The Release uses the word "name" but does not qualify it by explaining whether both the first and last name will be used. (*See* Aff. Michael Knott, Ex. B.) Resolution of this breach of contract claim requires interpretation of the language of the Release and is not the proper focus, which should be the threshold question of whether a plausible claim for breach of contract has been pleaded. *See Fowler,* 578 F.3d at 213. Here the facts, accepted as true, are sufficient to show an entitlement to relief. *See id.* at 211.

> C. The complaint states a plausible claim for negligence and negligent infliction of emotional distress

Counts three and six allege that defendants were negligent and that their negligence resulted in damage and emotional distress. "Negligence is conduct which falls below the standard established by law for the protection of others against an unreasonable risk of harm." *Restatement (Second) of Torts* § 282 (1965). "A cause of action founded upon negligence involves a breach of a duty of care that causes injury." *Weinberg v. Dinger*, 106 N.J. 469, 484, 524 A.2d 366, 373 (N.J. 1987). To make out a claim of negligence the plaintiff must establish four elements: (1) defendant owed plaintiff a duty of care; (2) defendant's conduct breached that duty; (3) the breach proximately caused injury to the plaintiff; and (4) the breach resulted in actual damage to the plaintiff. *See id. See also Pfenninger v. Hunterdon Cent. Reg'l High Sch.,* 167 N.J. 230, 240 (2001). To make out an independent claim for negligent infliction of emotional distress, a plaintiff must "demonstrate that the defendant's negligent conduct placed the plaintiff in reasonable fear of immediate personal injury, which gave rise to emotional distress that resulted in a substantial bodily injury or sickness." *Jablonowska v. Suther*, 195 N.J. 91, 104 (N.J. 2008).

The complaint alleges specifically that (1) defendants owed a duty to Sahoury and A.S. to "exercise reasonable and ordinary care in the filming, editing, production and dissemination of the breastfeeding video" (SAC ¶ 62); (2) defendants breached this duty by failing to take reasonable steps to protect the video when posting it to YouTube and including Sahoury's full name; (3) defendants should have known that such careless actions would result in damage to Sahoury and A.S.; and (4) as a direct and proximate result of defendants' carelessness, Sahoury and A.S. suffered severe injury by being associated with pornography.  Sahoury claims she became consumed with her efforts to clear her name and A.S.'s name and has suffered "humiliation, severe stress, anxiety, panic attacks, crying and shaking spells, vomiting, depression, sleeplessness, anger, [and] sadness . . . ." (*Id.* ¶ 48.)

In support of her assertion that defendants' acted negligently in producing and disseminating *Breastfeeding Help,* Sahoury alleges that the videos that defendants routinely post on the Parents® website are protected from being downloaded by third parties.  She asserts that in other instructional videos, including other breastfeeding videos, as a matter of policy defendants do not post the full names of the participating mothers or babies.  Moreover, defendants filmed a second breastfeeding video the day Sahoury's video was filmed—at the same location, with the same producer, cameraman, and lactation consultant—and in that video defendants did not put the full name of the participating mother on the screen.  Sahoury further alleges that Criso, the lactation consultant, called the producer after the pornography had been discovered to ask why Sahoury's full name was used in the video and claims that the producer "responded that she did not know and that she would have to look into it because it was not something they do." (SAC ¶ 27.)

Notwithstanding, defendants argue that the claims fail as a matter of law because they have no duty "to control the acts of a third party." (Defs.' Br. 13.) First, this mischaracterizes the pleadings, which do not allege that defendants had a duty to protect Sahoury and A.S. from the conduct of the third party who made the damaging pornographic videos, but rather that defendants' had a duty of reasonable care to protect them from careless exposure of the *Breastfeeding Help* video. The allegation rises naturally from the facts pleaded, where plaintiff, who was not being paid a professional fee nor seeking publicity for herself, put aside her natural fears, permitted her infant daughter to be filmed along with her, and demonstrated breastfeeding technique.

Second, as the cases cited by defendants state, "[d]etermining the existence of a duty of care involves identifying, weighing, and balancing several factors, including the relationship of the parties, the nature of the risk, the opportunity and ability to exercise care, and the public interest in the proposed solution" and this analysis is necessarily "fact-specific and principled." *Sanchez v. Indep. Bus Co., Inc.*, 358 N.J. Super. 74, 80–81, (App. Div. 2003) (internal citation omitted). This fact-specific weighing of numerous factors awaits discovery. Moreover, "[e]ven post-*Twombly*, it has been noted that a plaintiff is not required to establish the elements of a *prima facie* case" on a motion to dismiss, but rather "need only put forth allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Fowler*, 578 F.3d at 213 (internal quotation omitted).

Here, Sahoury has alleged facts that demonstrate a plausible claim for negligence and negligent infliction of emotional distress, and defendants' motion to dismiss with respect to counts three and six is denied.

> D. *The economic loss doctrine does not block the tort and fraud claims at the pleading stage.*

Defendants allege that even if the fraud and negligence claims (counts one, two, three, five, and seven) are properly pleaded, they are barred by the economic loss doctrine, which generally prohibits a plaintiff from recovering in tort or fraud for economic loss which flows from an entitlement under a contract. In other words, the doctrine prohibits fraud or tort claims predicated on the same underlying facts as a breach of contract claim. *See e.g., Saltiel v. GSI Consultants, Inc.*, 170 N.J. 297, 316 (2002); *Unifoil Vorp. v. Cheque Printers & Encoders Ltd.*, 622 F. Supp. 268, 271 (D.N.J. 1985).

Defendants' argument ignores that Rule 8(d)(2) permits plaintiffs to plead alternative and inconsistent claims in a complaint. The economic loss doctrine, if applicable here, would bar *recovery* where tort and fraud claims arise from the same facts as a breach of contract claim. It does not bar a plaintiff from pleading such claims.

Moreover, pertinent case law strongly indicates that the economic loss doctrine does not apply here. Nearly every case the parties have cited is predicated on a contract for the sale of goods or mortgage contracts. And defendants' argument for the doctrine constitutes a defense to the tort and fraud claims that assumes this Court will conclude the Release is a valid and binding contract, a finding the Court will not make at this juncture. The fact that defendants may have a defense to certain claims does not weigh on whether those claims have been sufficiently pleaded.

> E. *The complaint fails to state a claim for invasion of privacy, right of publicity*

The fifth count of the complaint alleges that defendants have violated Sahoury and A.S.'s privacy by using their names in the breastfeeding video "for trade purposes," and that defendants "appropriated for their own use and/or benefit the plaintiffs' names." (SAC ¶ 73.)

Both parties agree that New Jersey recognizes the common law tort of misappropriation of a person's name or likeness, which is sometimes called the right of publicity. (Defs.' Br. 20; Pls.' Opp. Br. 34–35.) *See Rumbauskas v. Cantor,* 138 N.J. 173, 179–82 (1994). To make a claim for misappropriation the plaintiff must show that (1) defendant used plaintiff's name or likeness and (2) the use was for commercial or trade purposes or to "advertise the defendant's business or product." *Castro v. NYT Television*, 370 N.J. Super. 282, 297 (App. Div. 2004). Here, it is undisputed that defendants used Sahoury and A.S.'s likeness and names. However, Sahoury has not pleaded facts that demonstrate the use was for trade purposes.

Under New Jersey law, a defendant is liable for misappropriation of likeness "only if defendant's use of plaintiff's likeness was for a predominantly commercial purpose, i.e., if defendant was seeking to capitalize on plaintiff's likeness for purposes other than the dissemination of news or information." *Tellado v. Time-Life Books, Inc.*, 643 F. Supp. 904, 909–10 (D.N.J. 1986). *See Hart v. Elec. Arts, Inc.*, 740 F. Supp. 2d 658, 667–68 (D.N.J. 2010) (Wolfson, J.) ("[T]he touchstone of the commercial purpose requirement is whether the publication uses the plaintiff's likeness for the purpose of capitalizing upon the name by using it in connection with a commercial project." (internal quotations omitted)). "A profit motive alone does not suffice as many nontortious uses of someone's likeness result in profits for their promoters. The use must be mainly for purposes of trade, without a redeeming public interest, news, or historical value." *Tellado*, 643 F. Supp. at 910.

Here, Sahoury alleged that by posting the *Breastfeeding Help* video to YouTube defendants demonstrated a "commercial purpose" because large companies post videos to YouTube to attract larger audiences, the videos are imbedded with company logos which promote their websites, and when a company website receives more traffic it can charge more to

advertise on its website. (SAC ¶ 26.) These allegations suggest nothing more than that defendants may have increased their profits by posting the video to YouTube. Sahoury's contentions suggest what may motivate companies to post instructional video content, but fail to demonstrate that defendants sought specifically to capitalize on Sahoury, or her daughter's, name or likeness. Moreover, the complaint fails to allege that the video lacked any redeeming public interest or news value. In fact, the complaint characterizes it as an "institutional or educational video." (*See id.*)

In *Castro,* a group of emergency-room patients who had been videotaped after executing a consent form asserted misappropriation of likeness claims. They claimed that the defendants' representatives presented themselves as hospital staff, rather than media employees seeking footage for a reality television show. Because the plaintiffs did nothing more than assert the legal conclusion that "[d]efendants appropriated plaintiffs' likenesses, images and/or names for commercial profit and advantage," the *Castro* Court dismissed their claim for failing to allege any facts that suggested the videotape footage had been used for trade purposes. 370 N.J. Super. at 289. In reaching its conclusion, the *Castro* Court, quoting from the *Restatement Second of Torts*, reasoned that

> broadcast of videotape footage on a television show does not give a person who has been videotaped the right to maintain an action for appropriation of his or her likeness because "[n]o one has the right to object merely because his name or his appearance is brought before the public, since neither is in any way a private matter and both are open to public observation. It is only when the publicity is given for the purpose of appropriating to the defendants' benefit the commercial or other values associated with the name or the likeness that the right of privacy is invaded. The fact that the defendant is engaged in the business of publication, for example of a newspaper, out of which he makes or seeks to make a profit, is not enough to make the incidental publication a commercial use of the name or likeness. Thus a newspaper, although it is not a philanthropic institution, does not become liable . . . to every person whose name or likeness it publishes."

*Id.* at 297 (quoting *Restatement (Second) of Torts* § 652C, cmt. d (1977)). The court further noted that "whether a videotape is broadcast in connection with a television story about important public events or a subject that provides only entertainment and amusement" is irrelevant. *Id.* at 298. Because the plaintiffs did not allege facts to show that their likenesses were used for a commercial or trade purpose, "for example, that any videotape footage of them was used for any specific promotional purpose," the court concluded plaintiffs failed to state a claim for which relief could be granted. *Id.*

Similarly here, the mere fact that Sahoury and A.S.'s names and likenesses were broadcast does not give rise to a claim for misappropriation where the complaint lacks factual allegations that suggest defendants had a predominately commercial purpose. There are no allegations that suggest their likenesses were used in any advertising of promotional materials. The mere fact that defendants may have profited in some way by producing and disseminating the *Breastfeeding Help* "institutional or educational" video is not sufficient to fulfill the "commercial purpose" element of the misappropriation tort. (*See* SAC ¶ 26.) Because the complaint states only a legal conclusion—that defendants used their names and likeness "for trade purposes"—the misappropriation claim fails.

V.   **Conclusion**

For the forgoing reasons, defendants' motion to dismiss the complaint is denied with respect to counts one through four, six and seven, and is granted with respect to count five. An appropriate order will be entered.


August 2, 2012                                          /s/ Katharine S. Hayden
                                                        Katharine S. Hayden, U.S.D.J.